RICHARDSON,&C.
vs.
HAYDEN &C.

Case 35.                    Richardson, &c. vs. Hayden, &c..

PET. EQ.                    APPEAL FROM PULASKI CIRCUIT.

A testator, by his will, directed his executors immediately after his
    death, to sell all his estate on a credit of twelve months which was
    not mentioned in the will, collect all outstanding debts for the pur-
    pose of paying his debts, and after doing so, to pay the residue to
    his wife. The executors sold certain lands of the testator on a cred-
    it of six months. The widow sought to set aside the sale, on the
    ground of fraud, and a departure from the will in selling at six rath-
    er than twelve months credit. Held, that the proof established no
    fraud, and that the sale at six instead of twelve months, was not such
    a departure from the terms of the power to sell as authorized the
    Chancellor to set aside the sale.

[The facts of the case are stated in the opinion of
the court.—REP.]

*F. T. Fox* for appellant—

The sale made by the executors of Jasper, of the
land, ought to be set aside on three grounds. 1.
The sale was made contrary to the provisions of the
will, and to the prejudice of the beneficiary under
the will. 2. The appellees, at the time of their pur-
chase, knew the value of the lands—that they were
good coal lands—which knowledge was obtained by
actual examination, and their depreciation of the
value of the land at the sale—concealing their knowl-
edge of the value of the land as coal lands; and 3d.
Their efforts to suppress competition amongst bid-
ders.

1. The executors had a naked power to sell, not
coupled with any interest, and having sold on terms
varient from those contained in the power, the sale is
invalid, and should be set aside. The following au-
thorities are referred to as bearing on this question:
*Wooldridge's heirs vs. Wilkins' ex'rs.* 3 *Bibb,* 349; *Baird
vs. Rowan,* 1 *Marshall,* 213; *Halbert vs. Grant,* 4 *Mon.*
582; *Shepherd's Touch.* 448, *sec.* 11. The appellees
rely on their want of notice of the provisions of the

will in regard to the terms of sale. This cannot avail. The will was of record, and they had constructive notice. Moreover, one of the purchasers was a son, and a devisee under the will. Knowing the terms of the will, the purchasers were bound to see that they were pursued by the executors. (*Haskins vs. Spiller*, 1 *Dana*, 170.)

2. The proof shows not only that the purchasers withheld their knowledge of the fact that the lands were valuable as coal lands, but in fact represented them as nearly valueless—not worth twenty-five cents per acre. (*Martin vs. Blight's heirs*, 4 *J. J. Mar.* 492.) The land is shown by the proof in the cause to be worth greatly more than it sold for. Inadequacy of price, coupled with slight evidence of fraud, will authorize the Chancellor to rescind a contract of sale.

3. The testimony shows, also, that persons intending to attend the sale, abandoned that purpose in consequence of the representations of some of the purchasers.

There is no pretence that the sale to the present appellants was champertous. (*See Chiles vs. Connelly's heirs*, 9 *Dana*, 385; *Blackerby vs. Holton*, 5 *Ib.* 520; *White vs. Roberts*, 4 *Ib.* 172; *Ramsey vs. Trent*, 10 *B. Monroe*, 336.)

*George Robertson* on the same side—

Having promised a friend to file a brief in this case, I proceed to redeem the pledge, without expecting to add much to the briefs which I find already in the case.

1. Mrs. Richardson, being a beneficiary under the will, has certainly a right to sue in equity to prevent a sacrifice of her interest by an abuse of the trust, or the fraud of the purchasers of the land. This is, in fact, her only remedy. A suit against the executor would be unavailing, because it would be impossible for her to show what the land would have sold for had the authority been pursued; and had there been no fraud by the purchasers, and if the sale was with-

RICHARDSON,&c. out authority, or affected by fraud, she has a clear
*vs.*                right to have it set aside on equitable terms, so that
HAYDEN, &c.          the power given by the will may be fairly and prop-
erly executed, whereby the debts may be paid and
something left to her as legatee.

2. There is no champerty in Mrs. R.'s contract
with her lawyers. They were to have no portion of
the thing sued for. If a lawyer prosecute an action
of slander for half the recovery, the contract is cham-
pertous; but if his fee be a sum to be measured by
half the amount of the recovery, the judgment is
only the standard of admeasurement, and he has no
control over or interest *in it;* and therefore, as often
adjudged, this latter contract is not infected with
champerty.

3. The will gave a *special* power to sell on prescrib-
ed terms. There was no general power, nor any
discretion as to the credit. A sale by the agent on
other terms, was without the testator's authority, and
consequently void as certainly as an agent's sale of
a horse on six months credit, when his only power
was to sell for cash would, as it undoubtedly would,
be void. The court, in such case, cannot speculate
on the question of loss resulting from such devia-
tion, and which could never be certified to the judi-
cial mind. It can only see that it was a sale by an
agent, without the authority of the principal, and
against his instructions. We insist, therefore, that the
sale in this case was void for want of authority to
make it, as made.

4. The sale was moreover fraudulent. Persons
were prevented from bidding by the sinister inter-
ference and false statements of the purchasers, or
some of them. The depositions of Lair, Wait, and
others, prove this. Lair was induced not to bid evi-
dently by the false representations of Hayden, (who
had examined the land,) that it was not worth twen-
ty-five cents an acre, and that his only motive for
bidding for it was to secure a passway to Lair's land,
which he said he *would* buy back of it if he could

purchase that passway.   Hayden knew that this depreciation of the land was false, and he offered Lair a bonus not to bid against him, by telling him that he *would* buy his coal land if he should be permitted to get the passway.   Lair's opinion that the sale was fair, cannot affect the facts, nor change the legal deduction from them.   And Lair says that he had told Hayden that he intended to bid against him, and the probability is that he would have done so had not Hayden silenced him by the falsehood and promise aforesaid.   Wait did bid, but was evidently silenced by the expectation that he would, by stopping, get an interest in it cheaper, if Jasper should buy it. Having asked Jasper if he would take in a partner, the reply was that he would—and *therefore* Wait ceased bidding.   He was evidently induced to do so by the intimation that he should be a partner with Jasper.   Other witnesses prove other facts of the same complexion, and the natural and only allowable conclusion, from all the facts on that point, is, that the purchasers prevented competition, and that was a fraud on the sale.   (*See Story's Equity*, 5.)

Moreover, there can be but little, if any doubt, that Hayden was a judge of coal land; had carefully examined this just before the sale, and satisfied himself that it could be worked profitably.   He had no right then to say that it was not worth twenty-five cents an acre, and was of no value except as a passway to Lair's coal land, nor to tell Lair that he was bidding for it merely to get a passway to his land, which he intended to buy, for he bought the land, not for such passway, but for its coal recently discovered by him, and he neither bought nor intended to buy Lair's land.   This was a plain fraud. His suppression of his secret knowledge of the coal was not a *technical* fraud, but it was grossly unconscientious, and aggravates the other fraud, and helps to tinge the whole conduct of the purchasers

The contract between Mrs. Richardson and Dugan, *pendente lite*, and especially as Dugan was a par-

RICHARDSON,&c.
    vs.
HAYDEN, &c.

ty to the suit and interested therein, was clearly not champertous. (*See Story's Equity on Champerty.*)

If the sale be set aside, improvements and rents will be an ulterior question, which can be settled on just and equitable principles. The purchasers had actual notice of the character of the power, but if they had not actual they certainly had constructive notice of it, as it was recorded, and knowing that the executor was selling under a testamentary power, it was their duty to see it, and they must therefore be presumed to have seen it.

*Bradley & Bacheller* on the same side—

Argued—1. The proof shows a combination between the purchasers to buy the land, and to get it for less than its value, by disparaging its value, and concealing the fact that it was valuable as coal land; professing to buy to obtain a passway to other lands which they designed to purchase, but never did purchase. The price given was greatly under the value of the land, as is shown by subsequent developements proved in the cause.

2. The executors exceeded their powers in the sale, and purchasers had full knowedge of the powers conferred by the will to make the sale, and what should be the credit given, and are to be so treated in this case.

3. The denials of the answer of the defendants is falsified, in several particulars, by the proof, and therefore should be disregarded in the whole.

4. The sale by the executors was totally unauthorized, not being made in accordance with the power given by the will. They were authorized to sell at twelve months credit, and sold at six months credit. If the executors could thus far violate the terms of the sale prescribed by the testator, might they not have sold for cash in hand? The principle is the same. It is clear that injustice has been done to both creditors and devisees. We suggest whether it was not the duty of the executors to petition the Chancellor to

order a sale; brought the creditors and devisees before the court, thereby apprising all concerned of the fund out of which the debts were to be paid; induced competition, and thereby insured a sale of the property for its full value, and requiring bond to execute the trust faithfully.

It is very certain that great injustice has been done by a sale of the land at an under value, and the sale ought to be set aside.

*A. J. James* for appellees—

When the proof in this case is scrutinized, no fraud on the part of the appellees is shown. It shows that the lands sold for a fair price, and for as much on a credit of six months as they probably would have sold for on a credit of twelve months—some thought, with the difference of the interest on the price.

2. There was not, in the execution of the power conferred on the executor by the will to sell the lands, such a departure as will authorize the court of chancery to set aside the sale. The court is referred to the following authorities as bearing on the question involved: 2 *Greenleaf's Cruise on Real Prop. side p.* 227–8, where it is said, by Seeley, Justice, in Bath and Montague case, "that where a person having the 'power of appointment execute it for the payment of 'debts, but the circumstances of the power were not 'exactly observed, there should be relief in equity, 'because the payment of debts was a most conscien-'tious thing, and fit for a court of conscience to take 'care of and see performed, and the precedents have 'all gone that way." Payment of debts was the primary object in this case. The intention of the donor of the power will be regarded in deciding upon the manner of its execution, and the court sometimes vary the form of executing the power, and sometimes reduce a general power to a particular purpose. (4 *Kent,* 345.) On this question the court is referred to the following authorities, as bearing on the question involved: (1 *Story's Equity, pages* 185-

RICHARDSON,&c. 6, *secs.* 172, 173, 174, 176; 2 *Story's Eq, secs.* 1063, 4,
      *vs.*
HAYDEN, &c.    *pages* 323, 324.)

The doctrine is distinctly stated, that under the power in a will to pay debts or portions out of the rents and profits of an estate, a sale will be supported, and the reason is because the object of the power is the thing to be looked to, and the means to attain that object, selected by the testator, may be varied.   Could a testator delay his creditor for ninety-nine years, until rents and profits would pay his debts?   Certainly not.   The execution of the power, under the will of Jasper in this case, to sell on a credit of twelve months to pay debts, was not abused by selling on a credit of six months; the object of the sale was attained, and it was not in the power of the executor who made the sale to refuse to perfect; and to refuse to carry it out was not in his power.   (See also, *Ducker, &c. vs. Stubblefield, &c.* 9 *B. Monroe,* 579; *Larue's heirs vs. Larue's ex's.* 3 *J. J. Marshall,* 159.)

The lands in this case were sold as coal lands, but because the extent of the coal and its quality had not been tested, there was a great risk to run.

The appellants stood by until the appellees had, at great expense, tested the value of the coal, and now seek to set aside the sale, and derive the benefit of all the outlay of the purchasers.   It is not equitable or just to set aside this sale, and the decree of the circuit court is right.

*James Harlan* on the same side—

After stating the substance of the pleadings, made the following points:

1. Whether Elizabeth Jasper, (who subsequently intermarried with Richardson,) can maintain this action?

The lands sought to be recovered were not devised to her by her late husband, Jasper.   The testator directed his executors to sell the lands and apply the proceeds to the payment of his debts, and if any sur-

plus remained, to pay it to his widow. The bequest to the widow was a contingent right to money. It is not pretended that the executor and his sureties are not amply able to pay any demand which the residuary legatee may establish against the executor for mal-administration of the estate. No charge of combination is alledged, or proved against the executor and defendants, Hayden, Hail, and Jasper. The executor is liable, on his official bond, for any mal-administation of the estate. A residuary legatee of money cannot call in question any contract between the executor and his vendees for property which the former was directed by the testator to convert into money, without some special and extraordinary cause, which is not alledged or proved in this case. James Jasper being the representative of Charles Jasper, dec'd, is the proper person to institute an action respecting any matter concerning the interest of the estate. If the title to the land in controversy rested in the heirs of C. Jasper, until the conveyance was made by the executor, the widow, who instituted this action, was not one of those heirs. She cannot maintain any action against the vendees of the executor for the land, or for the purchase money thereof. If that position be correct, it is an end to this case.

2. There was a substantial execution of the power to sell by the executor, and the title to the lands vested in the purchasers. It is well settled in this state, that where the testator directs his lands to be sold, the power may be executed by either of several executors who may qualify. (4 *Bibb*, 484; 3 *J. J. Mar.* 246; 2 *Dana*, 77.)

The direction, by the testator, to sell his lands and pay his debts, created a trust in favor of the creditors, and it was the duty of the executor to execute the trust in a reasonable time after his qualification. The testator directs it to be done *immediately* after his death, which event occurred between the 11th of February, (the date of the will,) and its probate, the 15th of April, 1850. The sale of the lands was made

RICHARDSON,&c.
*vs.*
HAYDEN, &c.

in August, 1851. The purchase money became due in February, 1852. The sale was made on a credit of six instead of twelve months. Is that departure a matter of substance. It is not, unless it can be shown that the lands would have sold for a much larger sum on the longest credit. But if that were shown, it would be a question of dollars and cents between the executor and the residuary legatee. In making an estimate of the difference it should be taken into the calculation that the debts against the estate were discharged six months sooner, by selling on six than on twelve months credit. It should be presumed that the debts against the *estate* bore interest. The power to sell is absolute and unconditional, and that power was executed by one whose right is not questioned or doubted. That clause of the will which prescribes the credit upon which the property, real and personal, was to be sold, is merely *directory*, in analogy to sales of property under execution, and cannot affect the rights of *bona fide* purchasers, who have paid their money, and which has passed into the pockets of the creditors of Charles Jasper, deceased.

3. Would the lands have sold for a greater sum on twelve than on six months credit? Has the plaintiff sustained, by proof, the affirmative of the proposition?

The plaintiffs attempt to sustain that position is a signal failure. If no loss has been sustained in consequence of a departure from the directions of the will, as respects the length of credit, the whole foundation of the action is gone. It is not pretended that the means of paying the debts against the estate were ample without selling the "coal lands." Then it was "a fixed fact" that those lands had to be sold, and the only matter in controversy is as to the *manner* of doing the *thing*. The power and duty of the executor to sell are not denied either by the original plaintiff or her assignee, Dugan.

4. The contract between Mrs. Jasper and her <span>RICHARDSON,&c.</span> counsel is champertous, and is within the letter and <span>*vs.* HAYDEN, &c.</span> spirit of the statute upon that subject. (*Revised Statutes*, 164.) The statute provides, that "all con-
' tracts, agreements, and conveyances made in con-
' sideration of the services to be rendered in the pros-
' ecution or defense, or the aiding in the prosecution
' or defense in or out of court, of any suit by any
' person not a party on record in such suit, whereby
' the thing sued for or in controversy, or any part
' thereof, is to be t aken, paid, or received, by such
' person, for his services or assistance, shall be null
' and void."

By the terms of the agreement between the plaintiff and her counsellors (Messrs. Fox and Wood,) the the latter were to pay the costs in the event of a failure to recover; but if the plaintiff was successful the counsellors were to have "*an amount equal to one-half of what is yet due on said estate.*" The whole management of the case was to be under the control of counsel, and the plaintiff was "to have nothing to do with the business at all." It seems to me that the agreement comes directly within the provisions of the statute. Whilst the case was pending in the court below the plaintiff sold her entire interest in the estate to one Dugan for $250, and he presents himself as a speculator in a law suit. As to what constitutes champerty, see 2 *Bacon's Abridgment, new edition*, 183; *Rust vs Larue*, 4 *Littell*, 413; 5 *Monroe*, 416.

There is a clear distinction between the case at bar and those of *Wilhite vs Roberts*, 4 *Dana*, 172, *and Ramsey vs Trent*, 10 *B. Monroe*, 336. Those were actions brought to recover land, and the fees were to be paid in *money*. In this case nothing could have been recovered but money, and the fee was to be paid in money. Besides the decisions in those cases were given before the adoption of the Revised Statutes.

5. Is there any evidence of fraud against the appellees to authorize any judgment against them?

A careful examination of the record will satisfy the court that the plaintiff has signally failed to obtain any proof of the charge of fraud alleged in the pleadings. The appellees had no agency in fixing the time, terms, or place of sale. They attended the sale as many others did. They formed their own judgment of the probable value of the lands offered for sale, and made their bids accordingly. The sale was open, public, and fair, and appellees being announced as the highest bidders they claimed the benefit of their bid, and the executor accorded it to them without any objection. Their opportunities of knowing the value of the lands were the same, and no better than other persons in the county. They were under no obligations, moral or legal, to express their opinions of the value of the land. Every man was free to form his own opinion on the subject. The lands were sold as "coal lands," and many persons were present who were regarded good judges of such property, and who would have embraced any opportunity that offered to purchase a bargain. No effort was made to deprive the appellees of the benefit of their purchase until nearly three years after the sale, nor until the value of the lands was developed by the expenditure of much money and labor. These improvements were made with full knowledge of the plaintiff, and nothing is heard from her during that period, of fraud in the purchase of the land. If these lands had remained in their natural condition this action would never have been instituted. It was gotten up as a speculation, and is now prosecuted by a speculator in law suits.

6. In conclusion it is insisted—1. There is not sufficient evidence in the record to disturb the appellees in their title and possession of the land in controversy. 2. That James Jasper, as executor, had power to sell and convey the lands. That the power was exercised by him in a manner which the chancellor will approve. 3. That the plaintiff, Elizabeth, as residuary legatee, has no right to maintain this ac-

tion, and call in question the sale made by the executor. That if she has suffered any wrong by the misconduct of the executor her remedy is against him and his sureties, and not against the vendees of the executor.

In support of these general propositions I refer to *Piatt's heirs vs McCullough's heirs*, 1 *McLean R.* 83; *Barr vs Hatch*, 3 *Ohio R.* 529; *Roberts vs Stanton*, 2 *Munford*, 129; 1 *Story's Equity, section* 169, *&c*; *Minish vs Cox*, 5 *Johnson Ch. R.* 446. These cases decide the general principle, that if the power has been executed, though not strictly according to the letter, and no injury has resulted, the court will not interfere.

Judge STITES delivered the opinion of the court.

Charles Jasper, of Pulaski county, died in 1850, leaving a will which was admitted to probate in April of that year.

He devised to his wife a female slave and some household furniture; and among other devises he gave to his daughter, Mariah, a slave named Wyn, provided his real and personal estate were sufficient to pay his debts, otherwise Wyn was to be sold, and if there remained any surplus his daughter Mariah was to have it. To his son, Tunstall, (an appellee,) he gave a debt on Campbell, and to Charles, a slave to be hired out until Charles arrived at age; if he died before, the slave was then to go equally to Tunstall and Mariah.

In the last clause of the will the testator says: "It 'is my desire that my executors, immediately after 'my death, sell all of my estate on a credit of *twelve* 'months, both real and personal, which is not men- 'tioned in the foregoing will, and collect all my out- 'standing debts for the purpose of paying my debts; 'and should there be any money left after the pay- 'ment of my just debts I desire it to go to my 'wife; and lastly, I hereby appoint my two brothers, 'John and James Jasper, my executors, &c."

RICHARDSON,&c.<br>*vs.*<br>HAYDEN, &c.

Sept. 30, 1857

RICHARDSON,&c.
.    vs.
HAYDEN, &c.

On the 10th November, 1851, James Jasper, as executor of Charles, sold publicly at the court house door, on a credit of *six* months, three several tracts of land, containing about two hundred acres, and an undivided half of another tract of fifty acres, for the aggregate sum of $385; and Hayden, Logan, Hale, and Trunstall Jasper jointly became the purchasers. The deed was made for the land, notes given for the purchase money, and afterwards paid.

In March, 1854, this suit was brought by the widow of the testator, who was a residuary legatee, for the purpose of setting aside and vacating the sale of the lands. During the progress of the cause she intermarried with Richardson, and their interest in the estate was transferred to Dugan, the husband of Mariah, the daughter of the testator, who was a devisee, and had been made a co-defendant, and who united with the original plaintiffs in asking a vacation of the sale.

The validity of the sale is the chief matter in controversy, and the action of the chanceller below in refusing to set it aside presents the main question in the case.

It is contended, for the appellants, that the sale should have been vacated upon one or both of the following grounds:

*First.* That there was a fraudulent combination between the purchasers to suppress competition in the bidding, by depreciating the actual value of the land, and concealing from others the important fact, known to them, that there was upon the land a valuable and extensive coal mine, by which combination and concealment others were deterred from bidding, and the lands sold at a ruinous sacrifice.

And, *second,* that the sale was void, not only because of the alledged fraudulent combination, but likewise because the directions of the testator, as to the length of credit, were violated, and the land sold upon *six* instead of *twelve* months credit.

With regard to the first ground, it is deemed suffi-
cient to say, that the allegations of fraudulent com-
bination and conduct are specifically denied by the
executor and the purchasers, and the proof to sus-
tain them is, in our opinion, wholly insufficient. The
time, place and manner of sale, the number of per-
sons present who were familiar with the land, and
all the circumstances then transpiring, conduce al-
most conclusively to show that there was neither a
combination nor an attempt to suppress competition
among bidders. And the evidence, with regard to
the then vendible value of the land, authorizes the
conclusion that the price for which it sold was then
deemed adequate, and as much as it would have
brought if it had been sold upon a twelve months
credit.

Nor is there anything in the record to warrant the
conclusion that the purchasers were guilty of misrep-
resenting the value of the lands, or the extent of the
coal thereon. It appears that the testator, knew, or
had satisfactory evidences, that coal could be had on
the land; and the same fact was known to the exe-
cutor and the neighbors generally. The extent and
value of the coal were uncertain—one to be ascer-
tained by actual examination, and the other depen-
dent, in a great degree, upon the quality of the coal
and facilities of getting it to market. The lands were
sold as coal lands, but whether the mines could be
profitably worked, and the property thereby ren-
dered valuable, was a matter of uncertainty, to be
determined in a great degree by actual experi-
ment.

There were, it appears, a number of coal men
present at the sale, all having equal opportunities of
judging of the value of the lands, which had been
advertised some time before. There was competition
among them in bidding, and for ought that appears
no unfairness; and because the purchasers had more
confidence in making profit by the coal, by railroads
and otherwise, and bid more than others were wil-

RICHARDSON &c.
*vs.*
HAYDEN, &c.

ling to risk in such an enterprise, and did actually by heavy outlays and actual experiment, prove the correctness of their judgment, it will not do, in the absence of other proof, to conclude that the purchase was predicated upon a knowledge of facts secretly obtained and wrongfully withheld on the day of sale, and thus convict the purchasers of fraud when, for ought that appears, the purchase was fair, and doubtless founded upon their confidence in working the mines profitably, although others equally familiar with the lands were of a different opinion.

A testator, by his will, directed his executors, immediately after his death, to sell all his estate, on a credit of 12 months, which was not mentioned in the will, collect all outstanding debts for the purpose of paying his debts, and after doing so to pay the residue to his wife. The executors sold certain lands of the testator on a credit of six months. The widow sought to set aside the sale on the ground of fraud, and a departure from the will in selling at six rather than 12 months credit. Held— that the proof established no fraud, and that the sale at six instead of 12 months credit was not such a departure from the terms of the power to sell as authorized the Chancellor to set aside the sale.

As to the second ground, to-wit, the departure from the terms of credit prescribed by the will, we have had more difficulty; but, upon an examination of authorities touching the question, and in view of all the facts, we have been led to concur with the chanceller below, and to approve of his decision in determining that the departure complained of furnishes no adequate ground for the interposition of a court of equity in behalf of appellants, as against the purchasers.

In the words of the circuit judge: "There is a clear 'unconditional power to sell for the distinctly de- 'clared purpose of paying debts, the surplus, if any, 'to go to the widow. This is a power coupled with 'a trust. The directions as to the manner or terms 'of executing the power are to sell on a credit of 'twelve months. The sale was upon a credit of six 'months—in this particular departing from the man- 'ner or terms directed. The power, however, to sell, 'is absolute and the purpose without qualification. 'The terms of sale are directory, but not a condition 'or proviso to the power of sale, nor a qualification 'as to the object. The exact thing directed to be 'done was done. The lands were sold. There was 'no excess in the execution of the power. Nor was 'there any defect in the deed of conveyance."

The thing complained of, is the departure from the terms of credit. That, in this case, as has been said, furnishes no just ground of complaint as against the purchasers.

The sale was for payment of debts, and the surplus, if any after the debts were paid, to go to the widow. The executor was trustee for these objects, the most important of which was the payment of the testator's debts, and which was obviously the chief and controlling intent of the testator in conferring the power upon the executor. And, in furtherance of such intent, courts of equity exercise a large power to give effect to what has been done in good faith to accomplish the object of a testator.

In *Bath vs Montague, Chancery Cases*, 3 *vol.* 98, and quoted in Greenleaf's Cruise on Real Property, 2nd volume, 571, it is said "that where a person having ' the power of appointment executed it for the *pay-* ' *ment of debts*, and the circumstances of the power ' were not exactly observed, there should be relief in ' equity, because the payment of debts was a most ' conscientious thing, and fit for a court of conscience ' to take care of and see performed."

In *Kent's Commentaries*, 4*th vol.* 345, the principle is stated, "that the intention of the donor of a power ' is the great principle that governs in its construction. ' And in furtherance of the object in view, the courts ' will vary the form of executing the power, and, as ' the case may require, either enlarge a limited to a ' general power, or cut down a general power to a ' particular purpose." And in *Story's Equity*, it is said, "that relief will be granted, not only when the ' defect arises from an informal instrument, not with- ' in the scope of the power, but also when the defect ' arises from the improper execution of the instru- , ment." (*Vol.* 1, 185.)

As has already been stated, the terms of credit are merely directory, and do not constitute a proviso or condition upon which the sale is to take place. The departure by the executor from these terms is neither violative of, nor repugnant to the power of sale, or the object of the trust; and although it might if productive of loss or injury to the residuary lega-

RICHARDSON,&c.
vs.
HAYDEN, &c.

tees, furnish them a cause of action against the executor and his sureties, (a question not now up nor intended to be decided,) still, as against the purchasers under a fair sale, and for adequate price, and holding under an executed contract, it presents no valid ground for the interference of a court of equity. (*Minuse vs Johnson*, 5 *Johnson Chy. reports*, 445; *Ducker vs. Stubblefield*, 9 *Ben. Monroe*, 577.)

It may be likewise said that the testator's directions with regard to the manner of the sale may be reasonably varied by the executor, where such variance is calculated to facilitate or expedite the accomplishment of the purpose of the testator, and will work no injury to the estate or parties interested. And especially will such reasonable variance be tolerated when made to accomplish so conscientious an end as the prompt payment of the testator's debts. (*2d Story' Equity*, 323, 324.)

Here as appears from the proof, the land was fairly, openly, and publicly sold, and brought an adequate price, or at least as much as it was then regarded as being worth, even upon the twelve months credit. The deeds made and purchasers let into possession. No injury resulted from the variance of the terms to the creditors or legatees, but, on the contrary, the effect was to facilitate the settlement of the estate, and enable the executor to pay the testator's debts as far as the proceeds would go, and thus attain the end contemplated by the power.

The appellants manifested no ground sufficient, in our opinion, to warrant a court of equity in disturbing the sale, and the judgment of the circuit court refusing to set it aside is approved of and *affirmed*.